UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JEFFERY DeANGELIS, | : | |
|     *Plaintiff*, | : | |
| | : | |
| v. | : | No. 3:18-cv-1689 (MPS) |
| | : | |
| DR. MAHOOB ASHRAF, et al. | : | |
|     *Defendants*. | : | November 6, 2018 |

## INITIAL REVIEW ORDER

On March 5, 2018, the plaintiff, Jeffery DeAngelis, an inmate currently confined at Osborn Correctional Institution ("Osborn") in Somers, Connecticut, brought a civil action *pro se* under 42 U.S.C. § 1983 against Dr. Mahoob Ashraf, Dr. Monica Farinella, the Correctional Managed Health Care ("CMHC"), the Connecticut Department of Correction ("DOC"), and DOC Commissioner Scott Semple for monetary and injunctive relief. Compl. [Doc. #1]. He claims that the defendants violated his Eighth Amendment protection against cruel and unusual punishment by acting with deliberate indifference to his serious medical needs. He also asserts state law claims of medical malpractice and negligence. For the following reasons, his complaint is dismissed in part.

I.    <u>Relevant Legal Principles</u>

Under 28 U.S.C. § 1915A, the Court must review prisoner civil complaints and dismiss any portion of the complaint that is frivolous or malicious, that fails to state a claim upon which relief may be granted, or that seeks monetary relief from a defendant who is immune from such relief. Although detailed allegations are not required, the complaint must include sufficient facts to afford the defendants fair notice of the claims and the grounds upon which they are based and to demonstrate a right to relief. *Bell*

*Atlantic v. Twombly*, 550 U.S. 544, 555-56 (2007). Conclusory allegations are not sufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic*, 550 U.S. at 570. Nevertheless, it is well-established that "[*p*]*ro se* complaints 'must be construed liberally and interpreted to raise the strongest arguments that they suggest.'" *Sykes v. Bank of America*, 723 F.3d 399, 403 (2d Cir. 2013) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)); *see also Tracy v. Freshwater*, 623 F.3d 90, 101-02 (2d Cir. 2010) (discussing special rules of solicitude for *pro se* litigants).

II. <u>Factual Allegations</u>

In 2012, Dr. Ruiz at Cheshire Correctional Institution prescribed the plaintiff Elavil[1] to treat his severe nerve pain. Compl. ¶ 6. The plaintiff exhibited a bad reaction to Elavil, which included suicidal thoughts and confusion. *Id.* at ¶ 7. Thus, Dr. Ruiz stopped the Elavil and prescribed Neurontin instead.[2] *Id.* at ¶ 8.

In July 2013, Dr. Valletta determined that Neurontin was ineffective in treating the plaintiff's condition. Compl. ¶ 9. Dr. Valletta discontinued the Neurontin and prescribed Lyrica[3] for the plaintiff, which was approved by the Utilization Review Committee ("URC"). *Id.* Dr. Valletta also ordered an echocardiogram ("ECG") for the

---

[1] Elavil is used for short-term treatment of various forms of depression and chronic neuropathic pain or to treat migraine headaches. Elavil, PSYCHCENTRAL, https://-psychcentral.com/drugs/elavil.

[2] Neurontin is a prescription medicine used to treat pain for damaged nerves or seizures. Neurontin Medication Guide, PFIZER MEDICAL INFORMATION, https://www.pfi-zermedicalinformation.com/en-us/patient/neurontin.

[3] Lyrica is a prescription medicine for treating fibromyalgia, diabetic nerve pain, spinal cord injuries, and pain after shingles. About Lyrica, LYRICA, https://www.lyrica.c-om.about-lyrica.

2

plaintiff, which was performed at the UConn Health Center on March 25, 2014. *Id.* at ¶ 10. The ECG showed cardiomyopathy tricuspid regurgitation[4] and right ventricular volume overload. *Id.* at ¶ 11. The cardiologist at UConn recommended annual ECGs to monitor the plaintiff's condition. *Id.* at ¶ 12.

The plaintiff has had severe heart problems since childhood. Compl. ¶ 13. He once spent weeks in the intensive care unit at Yale Hospital because three out of four of his heart chambers had shut down from pulmonary hypertension. *Id.* at ¶ 14.

On November 14, 2017, Dr. Joseph Breton diagnosed the plaintiff with Hepatitis-C and ordered additional testing. Compl. ¶¶ 15-16.

In December 2017, the CMHC and the DOC instituted a policy for correction officials to crush Neurontin and Lyica capsules into a powder for inmates prescribed to take such medications. Compl. ¶ 17. Dr. Breton told the plaintiff that those medications should not be crushed because they are non-narcotic and are meant to be dissolved in the stomach after ingestion. *Id.* at ¶ 18. Afterward, Dr. Breton informed the plaintiff that he was resigning his position in the DOC because the URC repeatedly denied his orders for testing and treatment of inmate patients. *Id.* at ¶ 19.

On March 20, 2018, Dr. Farinella, a member of the URC, ordered officials at Osborn to discontinue the plaintiff's Lyrica regimen, which he had been taking since July 2013, because the prescription was not part of a "habeas agreement." Compl. ¶¶ 20, 22.

---

[4] "Tricuspid valve regurgitation is a condition in which the valve between the two right heart chambers (right ventricle and right atrium) [does not] close properly. The malfunctioning valve allows blood to flow back into your heart's upper right chamber (right atrium)." Tricuspid Valve Regurgitation, MAYO CLINIC, htttp://www.mayoclinic.-org.diseases-conditions/tricuspid-valve-regurgitation/symptoms-causes/syc-20350168.

3

She recommended a trial of Neurontin or Capsaicin[5] for the plaintiff instead. *Id.* at ¶ 22. When he was called down to the medical unit, the plaintiff contested Farinella's order, claiming that there never was any "habeas agreement" and that his previous use of Neurontin in 2012 had proven to be ineffective. *Id.* at ¶¶ 21, 23. As a result, Dr. Valletta applied for, and received approval from, the URC to put the plaintiff back on Lyrica. *Id.* at ¶ 24. Health Services Administrator ("HSA") Furey also told the plaintiff that removing him from a Lyrica regimen could result in seizures or other dangerous health problems and that he would override Farinella's order. *Id.* at ¶¶ 25-26. The plaintiff continued to receive Lyrica for the next eight days. *Id.* at ¶ 27.

On March 29, 2018, the plaintiff was called down to the medical unit to be evaluated by Dr. Ashraf, Dr. Breton's replacement. Compl. ¶ 28. Dr. Ashraf informed the plaintiff that Dr. Farinella had once again discontinued Lyrica. *Id.* at ¶ 29. The plaintiff attempted to explain his medical history, but Dr. Ashraf stated that there was nothing he could do about the discontinuation. *Id.* at ¶ 30. He ordered Capsaicin cream for the plaintiff and said, "Go away now, thank you." *Id.* at ¶¶ 30-31.

As the plaintiff was walking out of the medical unit, HSA Furey approached him, and the plaintiff told Furey what Dr. Ashraf had said about Lyrica. Compl. ¶ 32. Furey asked Dr. Ashraf whether he was going to "detox" the plaintiff before removing him from Lyrica, to which Dr. Ashraf replied, "I'll take care of him." *Id.* at ¶ 33. Later that day, when medications were delivered, a nurse informed the plaintiff she did not have anything for him because Lyrica was discontinued. *Id.* at ¶ 34.

---

[5] Capsaicin is a topical ointment used to treat muscle, joint, or nerve pain. Capsaicin Topical, DRUGS.COM, https://www.drugs.com/mtm/capsaicin-topical.html.

4

The plaintiff began to suffer extreme withdrawal symptoms, including headache, fever, nausea, diarrhea, and chills. Compl. ¶ 35. He was unable to move, walk, sleep, or eat. *Id.* The symptoms continued for five days until he was called to the medical unit on April 3, 2018. *Id.* at ¶ 36. Because the plaintiff could not move, a nurse came to his housing unit and brought him 200 mg of Lyica, his usual dosage. *Id.* She informed him that the medical staff had "messed up [because he] was supposed to be tapered off" the Lyrica regimen. *Id.* Thereafter, the plaintiff submitted numerous requests, grievances, health services reviews, and appeals regarding the discontinuation of his Lyrica regimen. *Id.* at ¶¶ 37-39.

The plaintiff later learned that the DOC publicly announced its decision to terminate its long-standing contract with UConn Health Center, which provided healthcare to its inmate population. Compl. ¶ 40.[6] The contract was set to expire on July 1, 2018. *Id.* at ¶ 41. Commissioner Semple then hired Dr. Breton to serve as the new head of DOC Medical. *Id.* at ¶ 42.

Sometime in the spring of 2018, Dr. Wright attempted to order the plaintiff special shoe inserts to help reduce pain in his lower right foot, but the URC denied Dr. Wright's request. Compl. ¶¶ 44-45. The plaintiff asked Dr. Ashraf to appeal the URC denial, but Dr. Ashraf refused, stating "I am the doctor. [D]on't tell me my job. I'm not able to appeal." *Id.* at ¶ 46.

On May 5, 2018, the plaintiff wrote to HSA Furey complaining about his medical care and the lack of treatment from Dr. Ashraf. Compl. ¶ 43. On May 17, Furey called

---

[6] *See also* Connecticut DOC Set to Take over Inmate Healthcare from UConn, CORRECTIONALNEWS, correctionalnews.com/2018/08/02/Connecticut-doc-set-take-inmate-healthcare-uconn/.

the plaintiff down to the medical unit, returned his appeal from the health services review, and informed him that he had spoken with Dr. Breton who agreed that Lyrica was the appropriate medication to treat the plaintiff's nerve pain. *Id.* at ¶ 47. He had previously called and e-mailed Dr. Farinella, who refused to retract her denial of Lyrica, even after Furey had told her about the plaintiff's unbearable pain. *Id.* at ¶ 48. Furey added that Breton would answer the appeal and return the plaintiff to his Lyrica regimen. *Id.* at ¶ 47. Dr. Breton also spoke with Dr. Farinella, and she continued to refuse to reinstate the Lyrica regimen. *Id.* at ¶ 49.

A short time later, Dr. Ashraf refused to order an ECG for the plaintiff. Compl. ¶ 50. He never examined the plaintiff or listened to his heartbeat. *Id.* Moreover, the plaintiff had a rash on his face, and Dr. Ashraf prescribed Triamcinolone Acetonide cream, a topical corticosteroid. *Id.* at ¶ 51. However, the prescription made the plaintiff's rash worse, and despite multiple requests filed by plaintiff, Dr. Ashraf continued to order the cream for three months without monitoring the plaintiff's reaction. *Id.* at ¶¶ 52-54. He also failed to warn the plaintiff of the side effects of the drug, including burning, itching, and skin atrophy. *Id.* at ¶¶ 58-59.

On July 13, 2018, the plaintiff returned to the medical unit with red bumps all over his face. Compl. ¶ 56. The nurse gave him Benzoyl Peroxide and told him to stop using the cream that Dr. Ashraf had prescribed. *Id.* The nurse informed him that Dr. Ashraf should have monitored the plaintiff's usage of the corticosteroid. *Id.* at ¶ 57.

Sometime later, Dr. Ashraf prescribed Elavil for the plaintiff, despite the plaintiff's documented adverse reactions to Elavil. Compl. ¶¶ 60-61. He never informed the plaintiff that he was placing him back on Elavil. *Id.* at ¶ 61.

Dr. Ashraf refused to order any medication to treat the plaintiff's Hepatitis-C. Compl. ¶ 63. He stated, "Hep-C medication [is] very expensive, but you can live without it for years." *Id.* at ¶ 64. Dr. Ashraf also refused to order physical therapy for the plaintiff because it was too expensive. *Id.* at ¶ 68. The plaintiff asserts that Dr. Ashraf's refusal to order Hepatitis-C medication and physical therapy is part of a systemic policy by the CMHC and DOC to prevent inmate access to medications for financial reasons. *Id.* at ¶¶ 65-66.

The plaintiff has not seen a physician of any kind in months. Compl. ¶ 71. He continues to suffer from ulnar compression syndrome, and Dr. Ashraf refuses to order testing or treatment for his condition. *Id.* at ¶ 74.

III. Analysis

The plaintiff claims that the defendants acted with deliberate indifference to his serious medical needs, in violation of the Eighth Amendment, by stopping his Lyrica regimen, refusing to order cardiac treatment or testing, refusing to order any Hepatitis-C medication, instituting a policy of crushing Lyrica and Neurontin capsules for inmate consumption, refusing to provide him with physical therapy, and prescribing him Elavil despite his documented history of negative reactions to the drug. Compl. ¶¶ 75-80, 82-85. He also claims that Dr. Ashraf committed medical malpractice and negligence by failing to monitor his reaction to the corticosteroid used to treat his rash and failing to treat his ulnar nerve compression syndrome. *Id.* at ¶ 81.

A. Claims Against the CMHC and the DOC

The plaintiff is suing the CMHC and the DOC for instituting a policy of crushing

Neurontin and Lyrica tablets into powder, which is improper according to Dr. Breton. However, the plaintiff cannot recover damages against either defendant. The CMHC and DOC are not persons subject to liability under § 1983. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58 (1989) (state agency not a person within meaning of § 1983); *see also Figueroa v. Correctional Managed Health Care*, No. 3:16-CV-120 (VAB), 2016 WL 7428191, at *3 (D. Conn. Dec. 23, 2016) (CMHC not person subject to liability under § 1983); *Santos v. Connecticut Dept. of Corrections*, No. 3:04-CV-1562 (JCH) (HBF), 2005 WL 2123543, at *3 (D. Conn. Aug. 29, 2005) (DOC not person subject to liability under § 1983). Therefore, the claims for damages against the CMHC and the DOC are dismissed.

    B.  <u>Eighth Amendment Deliberate Indifference to Serious Medical Needs</u>

Deliberate indifference to a serious medical needs, in violation of the Eighth Amendment, occurs when an official knows that an inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it. *Harrison v. Barkley*, 219 F.3d 132, 137-38 (2d Cir. 1998) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). In order to prevail on his deliberate indifference claim, the plaintiff must show both that his medical need was serious and that the defendants acted with a sufficiently culpable state of mind. *See Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003) (citing *Estelle v. Gamble*, 429 U.S. 97, 105 (1976)). There are both objective and subjective components to the deliberate indifference standard. *See Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). Objectively, the alleged deprivation must be "sufficiently serious." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). Subjectively, the defendants must have been actually aware of a substantial risk that the plaintiff would

suffer serious harm as a result of their conduct. *See Salahuddin v. Goord*, 467 F.3d 263, 280–81 (2d Cir. 2006). Negligence that would support a claim for medical malpractice does not rise to the level of deliberate indifference and is not cognizable under section 1983; *see id.* at 280; nor does a difference of opinion regarding what constitutes an appropriate response and treatment. *See Ventura v. Sinha*, 379 F. App'x 1, 2–3 (2d Cir. 2010); *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998).

Here, the plaintiff is suing Dr. Farinella and Dr. Ashraf for stopping his Lyrica regimen, which caused the plaintiff to suffer severe withdrawal symptoms. He alleges that Farinella on at least two occasions discontinued his Lyrica regimen, and that Ashraf refused to provide the medication over Farinella's order, despite recommendations from other doctors and HSA Furey about the symptoms associated with withdrawal. The plaintiff also claims that Dr. Ashraf refused any treatment for his heart problems and Hepatitis-C. Construed liberally, these allegations state a plausible Eighth Amendment claim against Dr. Farinella and Dr. Ashraf in their individual capacities for damages and in their official capacities for injunctive relief.[7]

C.  Negligence and Medical Malpractice Claims

The plaintiff is also suing Dr. Ashraf for negligence and medical practice for failing to monitor his reaction to the corticosteroid he had prescribed for him and for failing to treat his ulnar nerve compression syndrome. Compl. ¶ 81. However, Connecticut General Statutes § 4-165 bars negligence claims against state officials, and § 4-160(b) bars medical malpractice claims against state officials absent authorization from

---

[7] *See Kentucky v. Graham*, 473 U.S. 159 (1985) (Eleventh Amendment bars claims for damages against state officials in official capacities).

9

the state claims commissioner. *See St. Pierre v. Tawanna*, No. 3:14-CV-1866 (VAB), 2017 WL 1053838, at *9 (D. Conn. Mar. 20, 2017). The Court also concludes that the plaintiff's claims against Dr. Ashraf for placing him back on Elavil, despite the plaintiff's documented history of negative reactions to the drug, and for failing to order physical therapy amount to mere negligence and/or a disagreement of the proper form of treatment, which is insufficient to satisfy the Eighth Amendment standard. *See Ventura*, 379 F. App'x at 2–3; *Chance*, 143 F.3d at 703. Therefore, the claims against Dr. Ashraf regarding the corticosteroid, the failure to treat the plaintiff's ulnar nerve compression disorder, the reinstatement of the Elavil prescription, and the failure to order physical therapy are dismissed.

D. Claims Against Commissioner Semple

The plaintiff is suing Commissioner Semple for deliberate indifference to medical needs under the Eighth Amendment "for failing, as Commissioner, to provide adequate medical care, when [the] plaintiff relies solely on prison staff to treat his serious medical conditions." Compl. ¶ 80. He alleges that Semple has known about the "systemic deficiencies in medical personnel and . . . treatment of [the] plaintiff and other inmates for years and has taken no action to provide medical personnel qualified to treat the needs of [the] plaintiff and other inmates." *Id.* at ¶ 73. His claim against Semple is conclusory and appears to be grounded solely in Semple's supervisory role as Commissioner.

"It is well settled . . . that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (internal quotation marks omitted); *see also Johnson v. Glick*, 481 F.2d 1028, 1034 (2d Cir. 1973) (doctrine of *respondeat*

*superior* does not suffice for claim of monetary damages under § 1983). A plaintiff who sues a supervisory official for monetary damages must allege that the official was "personally involved" in the constitutional deprivation in one of five ways: (1) the official directly participated in the deprivation; (2) the official learned about the deprivation through a report or appeal and failed to remedy the wrong; (3) the official created or perpetuated a policy or custom under which unconstitutional practices occurred; (4) the official was grossly negligent in managing subordinates who caused the unlawful condition or event; or (5) the official failed to take action in response to information regarding the unconstitutional conduct. *Wright*, 21 F.3d at 501; *Hernandez v. Keane*, 341 F.3d 137, 145 (2d Cir. 2003).

The plaintiff has not alleged any facts showing that Semple even knew about Dr. Farinella's or Dr. Ashraf's treatment of him or lack thereof. His claim against him is entirely conclusory and, therefore, cannot proceed. Although he seeks injunctive relief in addition to damages, the Court has already permitted his Eighth Amendment claim to proceed against Dr. Farinella and Dr. Ashraf in their official capacities, which is the same as a claim against the state. *See Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989) (suit against state official in her official capacity is suit against official's office). Thus, there is no reason for Semple to remain as a defendant to this action.

**ORDERS**

(1) The case may proceed on the Eighth Amendment claim for deliberate indifference to medical needs against Dr. Farinella and Dr. Ashraf based on the discontinuation of the Lyrica regimen and Dr. Ashraf's refusal to provide any treatment for the plaintiff's heart condition and Hepatitis-C. All other claims are DISMISSED.

The clerk is directed to terminate the CMHC, the DOC, and Commissioner Semple as defendants to this action.

(2) Because the plaintiff has paid the filing fee to commence this action, he, and not the Court, is responsible for serving the complaint on Dr. Farinella and Dr. Ashraf in their individual and official capacities. The Clerk shall send the plaintiff instructions for service of the complaint, together with two copies of the complaint, two copies of this order, two blank Notice of Lawsuit forms, two blank Waiver of Service of Summons forms, and one blank summons form. The plaintiff shall, within **thirty (30) days** after receipt of said forms, effect service on Dr. Farinella and Dr. Ashraf in their *individual* capacities by mailing one copy each of the complaint, this order, Notice of Lawsuit form, and Waiver of Service of Summons form to them at their business addresses. In that same time, he shall effect service on the defendants in their *official* capacities by mailing one copy each of the complaint and the summons form to the Office of the Attorney General, 55 Elm Street, Hartford, Connecticut 06141. The plaintiff shall file the return of service within **forty (40) days** after receipt of the materials from the Clerk.

(3) If either defendant refuses to waive service, then the plaintiff must arrange for in-person service on him/her in accordance with Federal Rule of Civil Procedure 4, and the defendant shall be required to pay the costs of such service under Federal Rule of Civil Procedure 4(d).

(4) The defendants shall file their response to the complaint, either an answer or motion to dismiss, within **sixty (60) days** from the date the notice of lawsuit and waiver of service of summons forms are mailed to them. If the defendants choose to file an answer, they shall admit or deny the allegations and respond to the cognizable claims

12

recited above. They may also include any and all additional defenses permitted by the Federal Rules of Civil Procedure.

(5) Discovery, pursuant to Fed. R. Civ. P. 26-37, shall be completed within **six months (180 days)** from the date of this order. Discovery requests need not be filed with the Court.

(6) All motions for summary judgment shall be filed within **seven months (210 days)** from the date of this order.

It is so ordered.

Dated at Hartford, Connecticut this 6th day of November 2018.

                                              /s/
                                          Michael P. Shea
                                          United States District Judge